Good morning, ladies and gentlemen. We're pleased to have Judge Pepper sitting with us this morning from Wisconsin. And the first case this morning is Toll Processing v. Kastalon. Ms. Fortuna? Good morning, Your Honors. May it please the Court. My name is Elena Fortuna, and I represent the Plaintiff Appellant Toll Processing Services, LLC in this matter. This matter is before the Court from the District Court level, a grant of summary judgment in favor of Defendant Kastalon and denying summary judgment in favor of Plaintiff Appellant Toll Processing. Your Honors, this is a very simple case with simple, undisputed facts and a straightforward summary judgment argument that ultimately was convoluted with legal errors and also improper determinations of reasonableness and other questions of fact at the summary judgment stage of the proceedings. By way of brief background, in December of 2006, Toll Processing purchased a steel pickle line. A pickle line includes a number of polyurethane coated steel rolls, which are the property that is the subject of this dispute in this case. Pickling is a surface treatment for steel in the steel making process. A band of steel runs through the pickle line. It goes through acid baths, which remove any surface impurities and contaminants on the steel. Once it goes through the line, it's then recoiled and sold to the customer. From the description of the steel pickling process, it's easy to understand that the steel pickle line rolls are an integral component of the pickle line. It cannot operate without these rolls. Now, when Toll Processing purchased the pickle line, it did not have a facility to reinstall and start operating the pickle line immediately, so it dismantled the pickle line and put the line in two separate storage locations. At this point, Castellan, who had previously been a service provider to Ryerson Steel, who owned the pickle line prior to Toll Processing, had agreed with Toll Processing that it would take the rolls and store the rolls at its facility until such time that Toll Processing could reinstall the pickle line and issue a purchase order for the refurbishment work on the rolls. There is no dispute that Castellan agreed to take the rolls into its facility, that it ultimately transported the rolls to its facility, ending in March 2008, they were all transported, that Castellan stored the rolls at its facility for approximately two years without incident or complaint. After two years of storage inside the facility, Castellan ultimately decided that it was going to move the rolls outdoors. It first greased the metal components of the rolls to prevent rust, wrapped the rolls, and then also tarped the rolls when they were stored outside to prevent them from exposure to the elements. Shortly after storage outdoors, in December 2010, Castellan ultimately decided unilaterally, without any notice or contact with Toll Processing, that it was going to dispose of all of these rolls to a scrap metal dealer. Now, at least three times a district judge refused the word abandoned, and this seems to be the pivotal issue. Abandonment, yes, Your Honor. It is. And at that stage that you just mentioned, there's, this is where I want you to clarify why they weren't abandoned. Well, Your Honor, the district court made its abandonment determination based on, it cited those cases to determine that abandonment could be decided by a court at the summary judgment stage, that it could be decided based on a matter of law. However, the three cases that the court relied on are factually and legally distinguishable because the holding was narrow. It was limited only to oil and gas leases. The holding did not say that property generally is abandoned if it's left for an unreasonable period of time. The cases specifically held that an oil and gas lease can be abandoned if there's a cessation of lease operations for an unreasonable amount of time. But didn't those cases also say, counsel, that a cessation of lease operation is a question of fact? They did. They did, Your Honor. So is the issue that they were oil and gas leases, and that the cases involved oil and gas, or is the issue that those cases actually found that abandonment, even in an oil and gas context, is a question of fact? I think you're right on point there, Your Honor. I would argue that it's both, that the oil and gas leases are their own sort of legal animal. There's jurisprudence that's specific to the application and interpretation of oil and gas leases, so they don't relate to this case. But also, Your Honor, you're very correct that the court in all three of the cases cited by the district court ultimately determined the abandonment issue after a trial on the merits, and in fact did hold that it's generally a question of fact. So this is, you've got personal property. I mean, actually, you can go in and look and touch the stuff and move it around. The oil and gas leases weren't that sort of situation. Right, right. And that was also a big distinguishing factor. It was a big distinction. Right. We're talking about a lease here, a contract. How much space did they take up? I'm not exactly sure. I mean, these were, they're large rolls. They're probably, gosh, I think they're, I want to say they're like six feet long, so they're certainly very large, and there was, I believe, 57 rolls that were ultimately transported to Kastelan. So they certainly took up space, and Kastelan's representatives testified that that's why they ultimately moved them outside, was to create space inside their facility. But yes, with those oil and gas lease cases, it's very different. There's no comparison when you're talking about abandoning a lease for property for the production of oil and gas. That cannot be compared to personal property. And so the district court made her determination based on these cases that are inapplicable to the instant case, where the court in those cases ultimately found it was a question of fact, and where the court in those cases clearly made the abandonment determination after a trial on the merits, which obviously did not happen in this case. Counsel? There's obviously a dispute of fact, then, about whether or not they were abandoned? Yes, Your Honor. And that's what, certainly, toll processing argued that at the district court level, that abandonment is not presumed under the law. Obviously, there has to be an intent to abandon, and as abandonment is Kastelan's defense, it would be Kastelan's burden to prove that there was intent to abandon. And what toll processing had argued before the district court was that there were several facts that negated an intent to abandon. Some of those facts were actually brought into the record by Kastelan. Those facts would include, I apologize, excuse me. Those facts would include that from the time that the rolls were transported to Kastelan for storage up through September of 2013, when the parties were engaging in depositions in this case, toll processing was engaged in ongoing negotiations for a joint venture to reinstall and operate the Pickle Line. How would Kastelan have known that? I'm sorry? How would Kastelan have known that? Well, they wouldn't, Your Honor, but the intent to abandon has to come from toll processing, and it has to be clear. And these facts show that there was no intent to abandon, that toll processing certainly didn't convey any sort of intent to abandon and didn't have the intent to relinquish possession and property ownership of these rolls. If they had, they certainly wouldn't have continued to negotiate to sell or reoperate the Pickle Line. The record indicates that there were contacts with two toll processing former employees, and those employees said, we don't work for them anymore, and we don't even know if toll processing was out of business. That's correct, Your Honor. Well, Mr. DeMette, who is Vice President of Kastelan, testified that he called Paula Dent and Carlos Monson, and you're correct that they were former employees of toll processing. The records actually disputed as to whether or not he called them at all. Ms. Dent certainly testified that she doesn't recall speaking with him prior to the disposal of the rolls, but only after the disposal of the rolls. However, the testimony of Mr. DeMette shows that he didn't ask about the rolls. He didn't ask who he should contact at toll processing about the rolls. He didn't indicate to anybody that he intended on scrapping the rolls. So there was no question regarding the rolls. And the fact of the matter is that these two employees didn't work for toll processing anymore, and they indicated that on the phone. He already had contact with Gus Shemp, who was a toll processing employee who managed the Pickle Line project. He had spoken to him on the phone in October 2008. They had exchanged emails. He had his contact information. He knew that he was a toll processing employee, but no phone call, no email to Gus Shemp to ask what's going on with these rolls, or to indicate that they were going to sell the rolls to a scrap metal dealer. Would you like to get some water? Yeah, I would. Thank you so much. Thank you. I apologize. The district court also, with respect to both conversion and the negligence claim, also ruled that alternatively that the Mormon doctrine would bar those claims. Now, the case law, again, that the district court relied on does not support the application of the Mormon doctrine to an conversion. The district court's opinion actually recognizes that there is a dearth of authority applying the Mormon doctrine to conversion, and the district court only cited to federal cases. Now, the Mormon doctrine is a creature of state law, and toll processing was unable to locate any Illinois state cases where the court applied the Mormon doctrine to the intentional tort of where courts in the Seventh Circuit, the Northern District of Illinois, as well as state court held that the Mormon doctrine does not apply to intentional torts. Therefore, the district court's ruling that the Mormon doctrine barred the conversion claim, it's just not supported by the case law, and also it's not supported by the type of claim we have here and the damages that arise solely out of a duty because of a contract. Now, here, we're talking about an extra contractual duty. There is a duty, a common law duty, not to wrongfully convert property, personal property, belonging to another, and that's the whole point of the tort of conversion, and if the Mormon doctrine  were applied to bar the conversion claim in this case, it's essentially eviscerating conversion outside of a civil theft context almost, and so the Mormon doctrine really has no application to the facts of this case because we're talking about this separate, independent act of conversion, which is a classic tort situation. With respect to the negligence claim, the district court again also made an improper reasonableness determination. The district court essentially said in its opinion that the negligence claim was barred for the same reasons that the conversion claim was barred, and the district court went on to conclude that Castellon acted reasonably in concluding that these roles were abandoned and ultimately selling them to a third party. Now, reasonableness or reasonableness is a classic jury question in a negligence case. Only in the clearest of circumstances can a reasonableness question be answered by a judge at the summary judgment stage, only when reasonable minds could not differ, and in this case, we don't have that here. We have somebody who took personal property belonging to another, agreed to hold it, agreed to store it, and safekeep it. These facts are undisputed, and then ultimately sold that property to a third party without a simple phone call or an email. Reasonable minds could absolutely differ on whether or not Castellon's conduct in this case was reasonable, and therefore it's a question of fact that the judge should not have answered. The judge essentially weighed the evidence and made a determination that should have been made by the jury. Is there anything in the record that would indicate that they scrutinized these things before selling them for scrap? Because I understand they were in various stages of deterioration. Some were better shape than others. It may not have been worth whatever the claim is, $400,000, but it may have been worth more than $6,000. Did anyone say they did whatever determined that that's all they were worth when they sold them for scrap, or did somebody just want to get rid of them? No, Your Honor. There's actually, that testimony was elicited during depositions in this case, and representatives from Castellon testified that they did not assess the value of the rolls, they did not inspect the rolls actually when they came into the facility, and they did not inspect the rolls when they left the facility. So there was no determination of the value of the rolls or any sort of inspection. The only testimony was that while they were in storage at Castellon's facility, they did not deteriorate or their condition didn't change based on the storage indoors, and then when they were moved outdoors, there was the greasing of the metal and the wrapping and the tarping to protect them from the elements. So there was no assessment of what condition the rolls were in at the time that they were scrapped. That relocating and wrapping them and all that, that must have encouraged some expense doing all of that. It did. I don't know if there was any specific testimony or evidence regarding the exact amount. I know that there was testimony that it did take time and effort and cost for Castellon to do that. Certainly, Toll Processing was not aware that they ultimately moved the rolls outdoors and certainly didn't ask them to do that, so I would argue that those costs were incurred voluntarily by Castellon. Well, this is where it gets into sort of that question, is that by going through all of that, they would, it implies at least, that they may have been expecting to recoup those extra expenses when they did whatever the rehab work was originally proposed, and that's why I'm wondering when they meticulously wrapped them and put them outside, you know, for space inside, that probably makes sense, that somebody must have determined that they were worth saving. Right, Your Honor, and that would be another point where we would argue that there, it sort of cuts against the abandonment argument, because the rolls were moved and greased and wrapped and protected towards the tail end of when they were being stored by Castellon, and so certainly if Castellon had obtained any sort of acknowledgement or intent from Toll Processing that they didn't want the why would they protect these rolls? I mean at that point they would have just sold them to a scrap metal dealer like they did ultimately in December 2010. All of these facts cut against intent to abandon, and again it's Castellon's burden to prove intent to abandon. It cannot be presumed and it certainly can't be determined by the trial court by making a reasonableness determination. What's the ultimate goal as far as, you know, can you get a trial or at least more on finding out determining fact questions in the trial, I guess? Is there going to be damages? Is this recovery of some kind of damages when you have no ability to even assess the actual value? Yes, Your Honor, we would, if it went back down to the district court level, we would ultimately seek damages in the replacement cost value. There is, it's certainly not the, it's not the general damages that somebody would recover in a conversion claim. However, there's case law to support the recovery of replacement costs as an alternative measure of damages whenever the fair market value is hard to assess or the goods are unique, and in this case there's testimony in the record that pickle line rolls certainly are unique and there really is no used market for pickle line rolls because they are essentially fabricated, excuse me, fabricated for a particular pickle line facility. So these rolls were created in fashion for this particular pickle line and it would just be virtually impossible to get the number of rolls that you need for a pickle line on some sort of used market and you'd ultimately have to retrofit them to work with this particular pickle line. So the only alternative to put toll processing back in the position that it was in prior to the conversion, prior to the negligent conduct of Caslon, is the recovery of replacement costs. Counsel, can you reach the contract question for just a moment? Sure. In your brief, you argued that the district court erred also in finding that there was no contract, and I'm just wondering if this whole discussion doesn't demonstrate that there was no contract because apparently the event that would terminate the storage provision was toll processing's submission of a purchase order for the reconditioning of any of these rolls that needed it. There's testimony that it wasn't reasonable to expect Caslon to store these forever, but there's no explanation as far as I understand the contract didn't envision a situation in which there would be no purchase order. And so if there's an event that may or may not occur and the contract doesn't contemplate what happens if that event doesn't occur or when that event is supposed to occur, how is that then a contract? Well, Your Honor, whenever at the time of contracting, there is no dispute that the parties agreed to the duration of the contract being tied to this future event. So I would argue that that term, the duration term, is not indefinite and there was a meeting of the minds on that because both sides agreed to that. Arguably, yes, it certainly took longer than anticipated or ultimately expected, and I know that there's testimony from Caslon's representative that their subjective understanding or meaning was that it was going to be for a short period of time. But again, and that's sort of what the district court honed in on, was Mr. DeMent's testimony that he thought it was going to be a short period of time. And again, I would argue that that gets really into a question of fact regarding the subjective meaning of a term. That doesn't necessarily negate the formation of a contract because there was a meeting of the minds on the term. And as far as if the event never occurred, then I would submit that Caslon would have the opportunity to allege a material breach of the contract and go back to toll processing and say, you never issued a purchase order. You're not reinstalling this Pickle Line facility. We're not storing these anymore. We have no take them out of our facility. Instead of doing that, instead of following the agreement, they ultimately just disposed of the roles unilaterally without making a phone call or sending an email to Gus Shem from toll processing who they knew about and had his contact information. Counsel, your time has expired. I'll give you a minute in rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the court. My name is Richard Nogle, and I appear on behalf of the defendant, Pelli Castellon, Inc. I'd like to begin by highlighting certain facts that show beyond dispute that these roles were abandoned and that there was no agreement between Castellon and toll processing for the storage of these roles. This Pickle Line was initially in service in 1989 by Ryerson Steel and was operated continuously from 89 to 06. So it's a 27-year-old machine that has thousands of parts. Toll processing dismantled this machine in 2006, and it currently sits in storage and has been in storage now for a decade. Toll processing has no employees or revenues. It is a single-purpose entity that was formed by ISSI as parents solely for the purpose of acquiring this Pickle Line and finding a partner to operate this Pickle Line because it requires a massive warehouse type of facility. Acid is involved, acid washes, so it requires quite a facility to run this massive 27-year-old machine. So toll processing does not have any employees, any revenues, and as a matter of fact, fired all of its employees a month after Castellon took possession of these roles in April of 2008. Gus Shemp that there was no person in 2010 or 11 for Castellon to call because toll processing had no employees. They weren't even in the phone book, I suppose. That's correct. There is no entity that you can find called toll processing readily available because it was a sole-purpose entity that its purpose was never... Were those facts presented to the district court? Oh, certainly, in other words, the fact is that there was no ability to contact toll processing. Yes, and the only person was this Gus Shemp with whom Mr. DeMent had conversations in one conversation in 2008 and didn't retain his email, thought that toll processing had gone out of business. The persons with whom Mr. DeMent dealt were Carlos Manzan and Paula Dent. They were Ryerson employees. They had a business relationship with Castellon for 17 years to refurbish these roles, so Castellon reasonably thought that toll processing was going to continue this Ryerson model and gratuitously took these roles for a very short period of time. All the parties agreed that the original contemplation was to store these roles for just a matter of weeks or months. Everybody agreed it was only for a few months? Yes. Initially... Everybody? Well, that's what the initial contemplation... Now, that morphed into an assertion that somehow Castellon agreed to store these roles virtually in perpetuity for no charge, which is why there is no valid contract here because that's not a valid meeting of the minds. It's an illusory problem, so that toll processing had no duty ever to issue a purchase order to Castellon. Why did I understand that, but they wrapped them when they moved them outside? These roles are massive. They're 12 feet long, 8 inches wide, require a crane to be lifted, so they were taking up a lot of space. Castellon still was hopeful that it would get a purchase order from toll processing and that these roles would be refurbished someday, so gratuitously... Did they communicate that to Castellon? I think that was the discussion between Paul Adent and Bruce Dement back in the winter of 2008. At any time over the next two years, did they communicate that? No. So the last communication with Paul Adent, who toll processing says was the authoritative agent to create this relationship, the last communication that Castellon had with Paul Adent was in March of 2008. Castellon didn't even know that Paul Adent was fired from toll processing a month after Castellon took possession of these roles, and Castellon reached out to Paul Adent two and a half years later in Carlos Manzan to say, is anything happening with toll processing? So in November of 2010, Bruce Dement calls Paul Adent and says, what's going on with toll processing? Are you employed? Is there anything going on? She says, there's nothing happening with toll processing. So based on that fact, based on the fact that Castellon had no communications with toll processing from October of 2008 until Shemp calls Castellon in June of 11, Castellon deemed that toll processing was out of business and that the roles were abandoned. Now, how do you deem that a corporation is out of business? Because it was formed for the purpose of operating this pickle line. Are they still in business? We don't know. As of today, we don't know. Maybe it's a paper entity, Your Honor. It could be a corporation, but it has no business. It has no, it's just like the cases we talked about. It never operated this pickle line. It was formed for operating this pickle line, and the expectation was it was going to do so immediately in 2008. Well, I mean, it'd be strange if we're here in court with an entity that doesn't exist. It may exist on paper, Your Honor. We don't know the facts as of today, but it doesn't have any operations. It doesn't have any employees. It doesn't have any revenues. It has a disassembled pickle line that's been in storage for a decade. Do you know where it's incorporated? What state? I believe it was Pennsylvania, but I'm not certain. Did you ever contact the Secretary of State in Pennsylvania to see who might contact? We did initially when this case was filed, but I don't believe the cast line did any of that back in 2010, because it was told its contact was Paula Dent, and there was no one else to contact. So it assumed there was no one else to contact, right? Were there any efforts made to find out who other employees, what the other employees of Till Processing might have been, who the CEO was, who the President was, who the COO was? Any efforts to identify anyone other than Paula Dent? Other than that phone call to Paula Dent, there was no such effort. I don't believe there were any such employees of Till Processing. Isn't that a fact question, though? I mean, isn't this whole about all of these detailed facts, doesn't that indicate to you that this is a question of fact as to whether or not the roles were abandoned? I think that the role of the abandonment is the passage of time. There's no dispute that there was no contact between Castillon and Till Processing from October of 2008 until June of 2011. So the District Court and the case law itself indicates that it's the passage of time that shows abandonment and the intent to abandon. So for two and a half years, there was no contact. And the last communication that Mr. DeMent had with Till Processing in October of 2008, Mr. DeMent initiated. He called this Gus Shemp and he sent an email saying, keep us posted, let us know what's going on with this pickler. And Till Processing totally ignores that request, doesn't keep Castillon informed for the next two and a half years. Would it change your argument if Castillon had been calling once a month to Till Processing and saying, how are things going, how much longer do you want us to keep this stuff? Would that change your argument? I believe Till Processing had a duty to keep Castillon apprised. That's not the question. Would it change your argument if Castillon had been reaching out to Till Processing and saying, do you want us to keep holding? No, Your Honor, if the answer was the same, the answer was the same, it's on hold, because the project was on hold in July of 2008, although Till Processing never told Castillon that, it's on hold today. So if the answer is that this pick line is on hold, keep in mind the rolls have no use unless this pick line is operational. And the alleged contract or alleged agreement was that somehow the purchase order was contingent upon Till Processing finding a partner to expend 8 to 13 million dollars, it cost 8 to 13 million dollars to get this machine operational, that somehow Castillon's obligations weren't going to be triggered until Till Processing found this partner and this operation to get the pick line up and running. So if I'm understanding that answer correctly, your argument is to us that if there had been fairly consistent contact between the two companies over that two and a half or three year period of time, it still would have been abandonment because two and a half to anything for these rolls, that it could still constitute abandonment. Did you ask to be paid for the storage? No. What was the date that they moved them outside and wrapped them? That was in mid, sometime in 2010, I believe. Okay, so this is where I have a problem, and that is that you talk about there's 2008, there's no contact and this kind of thing, but I look at that as a major move, and it was one that they incurred some expense in doing, in moving them outside and wrapping them carefully, and that to me is an acknowledgment that this is an ongoing thing, otherwise it would have abandoned them then, I guess, the way you're saying it, because there's no communication, but they wrapped them and oiled them and did whatever in order to preserve them, and did that apparently without telling, or at least trying to tell, toll processing. Did that on their own? That's correct, they did that gratuitously. And that unilateral act is an indication, to me at least, that there's certainly an assumption that there's going to be a future either to rehab them or do whatever the original thought was. As a gratuitous act to get the rolls out of the factory. You say gratuitously? Yes. And in the hopes that there would be some type of business relationship in the future. Yeah. Okay. Counsel cited this Hoffman Estates case, which is not a gas case, that says abandonment may be decided on a motion for summary judgment where a party's conduct is so decisive and unambiguous to justify the trial judge in deciding the question. We just spent 15 minutes or 10 minutes about how this is not ambiguous. Don't you think, I mean, these questions we've asked. We believe that the passage of time and the lack of communication is unambiguous and undisputed, and that that's what supports the abandonment. Well, you indicate you don't know whether they actually exist as a corporation. There's no indication that you actually made a very detailed search to try to find anybody that represents them. Judge Mannion pointed out that you moved the materials outside, but tried to keep them in good condition. That certainly makes it somewhat ambiguous whether or not you intended to keep storing them. The case law would suggest that the 32-month period of time without any contact would constitute abandonment. What case law with actual personal property rather than leases? There were no personal property cases that we could locate on the abandonment issue. And why do you suppose that is? Are you asking that the court adopt a bright line rule that after a certain amount of time passes, if there's been no communication, even though one party could have instituted communication, it's therefore abandonment? No, Your Honor, there's no bright line. It's a totality of circumstances, reasonableness, and I think each case is unique based on the factors of the case. And here we have a pickle line that's never become operational. Now, Toll Processing has never refabricated these rolls, so they're claiming replacement damages, and these rolls are essential, but they have never refabricated these rolls. They have estimates from 2011 of the cost of refabrication, and we believe that's also the improper measure of damages, because these rolls were bathed in acid. Some of them are as old as 1989. But they can't refabricate them now, right? Gone. They're gone. Well, that's what they're requesting, that we pay for the refabrication costs. I know, but you said they'd never refabricated them. I'm just wondering how they would do that. To date, they have estimates, they have the drawings, they've gone to contractors to get estimates to refabricate these rolls. They did so in 2011, but because this pickle line's not operational, they've not chosen to have the rolls manufactured to date. In 2011, that's when somebody from Toll Processing contacted Gas-O-Land, is that right? Yes. 2011? 2011? When the contact came from Toll? Yes. June of 2011 is when Gus Shemp called Mike DeMent and said, we might have a partner, we may need these rolls. Now, that partner, Severstall, fell by the wayside also. Now, so that's the first time that they discovered they weren't there anymore? Yes. Okay. And see, here's where I get back to the move. That was in 2010. Yes. We're talking about one year. One year between this very meticulous move, you can call it gratuitous or you can call it, I think it's pretty careful, where they grabbed them. So there's an obvious acknowledgement that there's something still going on, at least the way I see it, without a contact. That, and I can see where they could unilaterally move it as long as they're preserved, etc. But now, we're not talking about three or four years, we're talking about one year, space and time when they decided they were abandoned and there was apparently no effort whatever, at least to notify somebody before they scrapped them. Well, I respectfully disagree. We called this Paula Dent, which was the person that we negotiated this arrangement with. She's gone. She was supposed to be the one who was going to spearhead this Pickle Line effort. She was the one who ran the effort for Ryerson with Carlos Manzan. So we called the person that we were told was going to be the primary operator of the Pickle Line in 2008. We called that person in 2010 and she says that there's nothing happening with toll processing. I've not worked there for two and a half years. So wait, in 2010 they called Dent? Yes. And that's when they moved the stuff outside? They moved it before then. Just before that? Yes. Okay. So, all right. Well, that's what I'm trying to contract this, at least in real time. Yes. So the move outside occurred sometime in mid, I believe, 2010 and the call to Paula Dent occurred approximately November of 2010 and then there was no contact between toll processing and Casteline, other than those phone calls, from October of 2008 to when Shemp called Dement in June of 2011. You're going back to 08 again. On the issue of economic loss, the trial court properly found that the conversion claim was barred by the contract between the parties where the contractual duty was allegedly to store these rolls. These rolls would be held. And so since this duty allegedly arose from the contract, the Mormon doctrine would bar a claim for conversion under the economic loss doctrine. I'd like to go to the contract issue next, Your Honors. Toll processing admits it had no obligations to ever issue a purchase order to Casteline. Somehow the purchase order obligation was contingent on this future event, which was the reinstallation of the picket line, which has not and maybe will never occur. So the obligation to issue a purchase order was contingent on this reinstallation of the picket line and that has never, never happened. So therefore, that promise on toll processing's part was illusory. There's no consideration, no meeting of the minds. Wait a minute, a consideration. Then to make the contract, the consideration at the time was that they were going to perform the rehab. Now that may not be a balance on the teeter-totter, but at least it's certainly consideration. But there's been, there's no consideration on toll processing's part ever to issue a purchase order. Toll processing admits it never had an obligation to issue a purchase order unless the picket line was reinstalled. Well, of course, that's the problem is that they didn't rehab them because they didn't have a place to put them when they rehabbed them. But when they made the contract, at least for consideration, that was the only reason they were going to store them is because they knew, if you want to put it that way, they were going to have what I would consider probably a fairly extensive rehabilitation agreement contract or job and I assume they would have expected to get paid a fair amount, probably including some storage in there. That was the arrangement. I realize that's an open assumption. That was the arrangement. To say the agreement was without consideration or to contract is, that is consideration, at least the way I see it. A future promise to issue a purchase order that never has to be issued? I admit that it never occurred, et cetera, but when you make an agreement and part of that agreement or understanding, okay, is that they will have a job at a time in the future. That's why they're storing them in anticipation of rehabbing them. But there was no requirement on toll processing's part to have that job or issue any orders to Castillon, which is why the promise is illusory. If we moved them out and had somebody else rehab, I think that would be a problem. There was also no agreement on the time limits for the contract. The initial understanding would be for months and here we stand in 2016, there was an agreement, purchase orders have never been issued. The toll processing's position is that Castillon had to store these rolls indefinitely. There was further no agreement on the purchase orders as far as price, delivery, what type of purchase order is going to be issued by toll processing to Castillon. No agreement on storage costs or time for delivery. So based on those reasons, we respectfully ask this court to affirm the ruling of the district court. Thank you. Thank you, Counselor. Thank you, Your Honors. I'll be very brief. I just wanted to note that Counsel for Castillon spoke about how Castillon did try to reach out to toll processing before disposing of the rolls by calling Paula Dent. However, when Paula Dent articulated to Michael DeMent from Castillon that she was no longer employed by toll processing, the burden was on Castillon to then speak to Gus Shemp, who Castillon's counsel admits that Mike DeMent spoke to Gus Shemp in 2008. They exchanged emails. Clearly there was knowledge that there was another contact at toll processing. And as Your Honors pointed out, the fact of the matter is that there was no effort to at toll processing, to call toll processing, which is still a company. It has not been dissolved. It is still an active entity to this day. Does it have officers, corporate officers, officers? It does. It does. It's the managing member of the company is International Steel Services, Inc., which is the obviously parent of the corporation. And so, Your Honors, basically, the claims at issue are straightforward. The elements have been established. And this case was granted summary judgment in favor of Castillon based on these affirmative defenses involving reasonableness, determinations, and questions of fact that should not have been made by the trial judge at the summary judgment stage. And so toll processing would respectfully request that the court overrule the determination court's decision in granting summary judgment in favor of Castillon and remand this case back to the trial court for further proceedings. Thank you, Your Honors. Thanks, Counsel. Thanks to both counsel. The case will be taken under advisement.